**HB**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

George Bochetto, Esq.
Bochetto & Lenz
1524 Locust Street
Philadelphia, PA 19103
Attorney I.D. 27783

Thomas Sullivan, Esq.
Marks & Sokolov, LLC
1835 Market Street, 28th Floor
Philadelphia, PA 19103
215-569-8901
Attorney I.D. 63541
Attorneys for Plaintiffs

08 5651

| | |
|---|---|
| BRUCE S. MARKS and MARKS, LLC d/b/a/ MARKS & SOKOLOV, LLC, | : <br> : <br> : <br> : |
| PLAINTIFFS, | : <br> : |
| V. | : |
| ALFA GROUP a/k/a/ CROWN FINANCE FOUNDATION, ALTIMO HOLDINGS & INVESTMENT LTD, and FINANCIAL DYNAMICS LTD, | : <br> : <br> : <br> : |
| DEFENDANTS. | : <br> : <br> : |

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Bruce S. Marks ("Marks") and Marks, LLC d/b/a Marks & Sokolov, LLC

("MS") complain against Defendants Alfa Group a/k/a Crown Finance Foundation ("Alfa"),

Altimo Holdings and Investment Ltd. ("Altimo"), and Financial Dynamics Limited ("FD") as

follows:

## PRELIMINARY STATEMENT

1.    Marks is a well respected attorney who has built a practice at MS over ten years of representing persons harmed by fraud and corruption in Russia and Ukraine by finding means to bring their claims in the United States.   Plaintiffs have filed numerous cases against Russian and Ukrainian criminal and business groups, including many powerful oligarchs, from the firm's sole United States office in this District.

2.    One such action filed by Plaintiffs was *Norex Petroleum Limited v. Access Industries, Inc. et al* in the Southern District of New York which accused defendants, including Alfa, of taking over an oil company in Russia owned by Norex Petroleum Limited, a Canadian company, through corruption, bribery, money laundering, and extortion in violation of RICO. The complaint, as amended, attached evidence that Alfa bribed Cuban and Russian officials in one scheme and paid kickbacks to the corrupt Saddam Hussein regime in the United Nations "Oil for Food" scandal.

3.    The *Norex* lawsuit received substantial publicity, including a major television documentary on Alfa and Mikhail Fridman, a powerful Russian oligarch and the principal beneficial owner of Alfa, on the "Fifth Estate", Canada's equivalent of "Sixty Minutes."

4.    On November 12, 2008, in apparent retaliation, Defendants instigated a world-wide media campaign to smear Plaintiffs by distributing press releases, a letter, a memorandum, and attachments (collectively, the "Releases") through emails and hard copies throughout the world.

5.    The Releases concerned a dispute between Altimo, which is controlled by Alfa, and Telenor, a Norwegian company, over the control of Kyivstar, a Ukrainian telecommunications company. The Releases accused Telenor and its "network of firms" of illegal activity designed to harm the reputation of Altimo, Alfa, and their shareholders.

2

6.   Specifically, the Releases alleged that Plaintiffs were involved in illegal activity, including that Plaintiffs "initiated a number of paid publications in the Russian media to discredit Altimo, Alfa Group, and their shareholders".   The Releases alleged that Plaintiffs instructed Garda World, a UK based company, to effect these paid publications purported to accuse Alfa of involvement in a murder in Latvia.

7.   The Releases attached various "evidence" to support the allegations, including an email dated April 10, 2008, purportedly from Marks, which stated that Marks was not going to pay a company known as "Lobbynet" for the Russian media publications because they were not sufficiently effective.   The Releases also attached an email from Stuart Lessor, a public relations professional, dated Wednesday, August 28, 2008, which refers to a "Bruce", i.e. Marks, regarding efforts to discredit Altimo's "AB", which refers to its "International Advisory Board."

8.   The Releases about Plaintiffs were completely false.  Plaintiffs were never instructed by Telenor on any matter, let alone the Altimo dispute.    Plaintiffs never had any relations with Garda World or Lobbynet on any matter, let alone the Altimo dispute.  Plaintiffs never engaged anyone to plant paid articles in the Russian media related to Altimo, Alfa, and Fridman and the Latvian murder.

9.   The fraudulent Marks' April 10, 2008 email is fabricated; Stuart Lessor stated in the media that his email was fabricated -- August 28, 2008 was in fact a Thursday, not a Wednesday.

10. In short, in a classic "two birds with one stone" approach, Defendants distributed knowingly false allegations and fabricated documents to the world-wide media in a deliberate and malicious attempt to harm Telenor and, in retaliation for filing the *Norex* suit, to destroy the reputation of Plaintiffs in regard to a dispute in which Plaintiffs had literally no involvement.

## JURISDICTION AND VENUE

11.     Jurisdiction lies under 28 U.S.C. §1332(a) because there is complete diversity of citizenship between all Plaintiffs and all Defendants and the amount in controversy is in excess of $75,000.

12.     Venue lies in this District because (a) Plaintiffs are resident in this District and the intentional harm which Defendants maliciously caused Plaintiffs was directed at this District and (b) upon information and belief, Defendants attempted illegally to intercept emails and obtain material from Plaintiffs' office in this District.

## PARTIES AND PRINCIPALS

13.     Plaintiff Bruce S. Marks is a citizen of the United States and resident of Pennsylvania.

14.     Plaintiff Marks, LLC d/b/a Marks & Sokolov, LLC is a limited liability company organized under the laws of Pennsylvania.   Its sole member is Marks.

15.     Mikhail Fridman, though not currently party hereto, is the principal beneficial owner of Alfa and one of Russia's richest oligarchs, worth over billions of dollars according to Forbes Magazine.   He is the chairman of the board of directors of Alfa.

16.     Defendant Alfa Group a/k/a Crown Finance Foundation is organized under the laws of Liechtenstein where, upon information and belief, it maintains its principal place of business.

17.     Defendant Altimo Holdings & Investment Ltd. is organized under the laws of the British Virgin Islands with, upon information and belief, principal places of business in London, England and Moscow, Russia.   It was formerly known as Alfa Telecommunications.

4

18.     Andrei Kosogov ("Kosogov"), though not currently party hereto, is the Chairman of Altimo and a member of the board of directors of Alfa.

19.     Defendant Financial Dynamics Limited ("FD") is organized under the laws of England and Wales with, upon information and belief, its principal place of business in London, England.   It engages in public relations through offices located in the United States and England. FD disseminated the Releases to the world-wide media on behalf of Altimo, Alfa, Kosogov, and Fridman.

## FACTS

20.     Marks is a well respected attorney who has developed a practice over the past ten years of representing persons who have been harmed by fraud or corruption in Russia or Ukraine.   Because of corruption in the Russian and Ukrainian court systems, Plaintiffs have developed a specialty of finding means to bring these cases in the United States and other jurisdictions which maintain impartial court systems.

21.     In the almost 25 years since Marks became a member of the Bar, Marks has maintained a reputation of effective advocacy and honesty.   He has never been accused of, let alone sanctioned for, illegal conduct.   The success of Marks' practice depends on this stellar reputation.

22.     Marks also served as a state Senator in Pennsylvania and wishes to have the option to serve in public office in the future.   Allegations of illegal conduct could destroy and, in any event, make much more difficult, such an option.

### The *Norex* Case and Alfa

23.     In 2001, Marks filed *Norex Petroleum Limited v. Access Industries, Inc. et al* in the Southern District of New York. [1]    The complaint, as amended, alleged that Alfa conspired to take control of an oil company owned by Norex in Russia through fraud, corruption of court proceedings, bribery, money laundering, and extortion in violation of RICO.    Excerpts from the Amended Complaint (Pages 1-5) are attached hereto as Exhibit A.

24.     The complaint attached evidence that Alfa bribed Cuban and Russian officials in one scheme and paid kickbacks to the corrupt Saddam Hussein regime in the United Nations "Oil for Food" scandal.   Norex also filed with the Court a document marked "secret' received from the CIA in response to a Freedom of Information Act request which stated that an American citizen who was then an officer of TNK, a company controlled by Alfa, admitted bribing Russian officials.

25.     The *Norex* lawsuit received substantial publicity, including a major television documentary on Alfa and Fridman on the "Fifth Estate", Canada's equivalent of "Sixty Minutes." Upon information and belief, this adverse publicity caused harm to Alfa and Fridman.

26.     Alfa has reputedly engaged in criminal and otherwise illegal or unethical activity. In one instance, pled in the *Norex* case, BP-Amoco, now known as BP plc, convinced the Clinton Administration to withhold an Export-Import Bank guaranty for the benefit of TNK, unless it returned assets purloined through corrupted court proceedings.  BP and Alfa settled this dispute in 2003 and formed a joint company known as TNK-BP; however, in 2008, a new dispute arose by which the TNK-BP president aligned with BP fled Russia and went into hiding in response to threats by Alfa, according to media reports.

---

[1] The complaint was originally dismissed for *forum non conveniens* in 2004.   The Second Circuit reversed this decision in 2005.  The complaint was dismissed for lack of subject matter jurisdiction in 2007; the matter is now on appeal.

## The Altimo/Alfa Dispute With Telenor

27.     Altimo, Alfa, and its controlling individual Fridman,  have been involved in a pro-longed dispute with Telenor over the Kyivstar, a Ukrainian telecommunications company worth billions of dollars, as well as Vimpelcom, a Russian telecommunications company worth billions of dollars.   The disputes have involved litigation and arbitration throughout the world.

28.     In *Storm LLC v. Telenor Mobile Communications AS*, 2006 U.S. Dist. LEXIS 90978 (S.D. N.Y. 2006) and *Telenor Mobile Communications AS v. Storm LLC*, 524 F.Supp.2d 332 (S.D. N.Y. 2007), the court found that Altimo through controlled entities engaged in collusive litigation in Ukraine in an unsuccessful attempt to avoid arbitration in the United States related to Kyivstar.   Most recently, in *Telenor Mobile Communications AS, v. Storm LLC et al,* Case 1:07-cv-06929-GEL (S.D. N.Y. November 19, 2008), the court found Storm, LLC, the company through which Alfa and Altimo own Kyivstar, in contempt of court by refusing to honor a confirmed arbitration award; Altimo and various related entities were severely sanctioned for engaging in an "extensive and brazen history of 'collusive and vexatious litigation'" in Ukraine.

## The Allegations and Documents

29.     On November 12, 2008, Defendants distributed press releases containing a letter dated November 12, 2008 from Kosogov on behalf of Altimo to Telenor (the "Kosogov Letter"), a summary memorandum (the "Defamatory Memorandum"), and various attachments (the "Attachments") through emails and hard copy.   The Letter, Defamatory Memorandum, and Attachments (collectively, the "Releases") are attached hereto as Exhibit B.

30.     The Releases were distributed to media worldwide.

31.    The Kosogov Letter alleged that there was "questionable activity directed at Altimo and the members of its International Advisory Board consisting of prominent political and business leaders", listing them by name, Sir Francis Richards, Lord Hurd, Kurt Hellström, Sir Julian Horn-Smith, Jack Rosen, and Peter Watson.

32.    The Kosogov Letter alleged:

> "A network of legal firms and public affairs agencies in Russia and the UK appear to have undertaken black PR campaigns in the media to try to discredit Altimo, its parent company Alfa Group, and its shareholders involving methods such as payments to journalists and newspapers for publication of information."

33.    The Kosogov Letter stated that the International Advisory Board wrote a similar letter to Telenor.

34.    Under the heading "Illegal and inappropriate activities of Telenor management against Altimo", the Defamatory Memorandum alleged that Telenor engaged in wrongdoing through a "network of firms".

35.    The Defamatory Memorandum alleged the wrongdoing is evidenced by "documents [which] were presented to Altimo by one of the former agents of Telenor."

36.    The Defamatory Memorandum alleged the "network of firms" included:

> *"Garda World and Hakluyt*, two UK-based companies who directed both detective investigations and PR campaigns against Altimo. <u>The former has been instructed by *Marks&Sokolov*, a legal company operating in the UK, U.S., and Russia.</u>
>
> *PBN*, an American PR-agent and lobbyist based in Moscow.
>
> *Lobbynet*, a Russian firm notoriously known for 'black' PR campaigns in the local media."

(emphasis added).

37.    The Defamatory Memorandum attached three articles which allegedly appeared in the Russian media as attachment 1.   In describing these articles, the Defamatory Memorandum alleged:

> "In late March 2008, *Marks&Sokolov* initiated a number of paid publications in the Russian media to discredit Altimo, Alfa Group and their shareholders.  The campaign was directed through *Garda World* and managed in Russia by *Lobbynet.*   The publications concerned the sudden death of Leonid Rozhetskin, a Russian businessman previously involved in the Megafon affair, and speculated about Alfa's involvement in the plot.  As a result, three paid for articles appeared in Russian tabloid publications between 02 and 07 April, all discrediting Altimo and Alfa Group."

(emphasis added).

38.    The Defamatory Memorandum attached a purported email dated August 28, 2008 from Bruce Marks with his correct email address to a Garda-World email address as attachment 2.  The email stated:

> "Craig:  I am not impressed with Lobbynet's PR attempts in Russia.  Their three articles to date have clearly not had the desired impact.  It is obvious that they have chosen media which lacks both integrity and the ability to impact.  Please inform them that I will withhold payment as per our original contract until I see some positive results and show them to Telenor.  I wait to hear how they intend to rectify the situation."

39.    The Defamatory Memorandum attached a purported email dated Wed., August 28, 2008, from Stuart Lessor of the PBN Co., a public relations company which acts for Telenor, as attachment 6.   The email stated in part:

> "Alfa proactively use AB to a) get lobbying contacts in the UK and elsewhere; (b) as shield against media accusations; c) as link to investment bank.  They never work, but their names do.  As you are well aware, Bruce reports XX is also impressed by the composition of the AB, apparently acquainted with one of its U.S. fellows."
> (emphasis added)

40.    "Bruce" was intended to refer to Marks.

41.     The obvious and intended message to the average recipient of such publication is that Plaintiffs are unscrupulous and law evading and resort to any dastardly practice to achieve a result.

### The Utter Falsity of the Allegations and Fabrication of Documents

42.     The above allegations and intended message about Plaintiffs are <u>completely</u> false.

43.     Plaintiffs were <u>never</u> instructed by Telenor on any matter, let alone related to the Altimo dispute.

44.     Plaintiffs <u>never</u> had any relations or a contract with Garda World or Lobbynet on any matter, let alone related to the Altimo dispute.

45.     Plaintiffs <u>never</u> engaged anyone to plant paid articles in the Russian media related to Alfa, Altimo, and Friedman and the Latvian murder.

46.     Bruce Marks' purported April 10, 2008 email is <u>fabricated</u>; he never sent such an email.  In fact, he has <u>never</u> sent an email to anyone at Garda World or Lobbynet.

47.     Stuart Lessor has stated in the media that the August 28, 2008 email was <u>fabricated</u>; in fact, August 28 was a Thursday, not a Wednesday.

48.     In short, Defendants distributed knowing false allegations and fabricated documents to the world-wide media in a "two birds with one stone" malicious attempt to harm Telenor and, in retaliation for the *Norex* suit, to destroy the reputation of Plaintiffs in regard to a dispute in which Plaintiffs had literally <u>no</u> involvement.

49.     Defendants knew, or were reckless in not knowingly, the allegations were false and the documents fabricated.

### The Maliciousness of Defendants' Conduct

50.     Defendants' maliciousness is evidenced by the knowingly falsity of the allegations and fabricated documents which they published and their reckless disregard for the truth.

51.     Defendants' maliciousness, or, alternatively, recklessness, is evidenced by their failure to confront (and purposeful avoidance to even contact) Plaintiffs with the allegations or "evidence" to among other things corroborate their authenticity prior to distribution of the Releases to the world-wide media   Defendants did not even attempt to corroborate the allegations and documents with Telenor prior to publishing them; the letter to Telenor and the Releases were sent on the same date.

52.     Defendants' actual malice is also evidenced by Defendants' failure to retract the knowingly false allegations despite demand by letter dated November 14, 2008, attached hereto as Exhibit C.

53.     By choosing Plaintiffs out of all of the firms in the world who could have engaged in the alleged activity of purchasing false media articles about Altimo, Alfa, and Fridman, Defendants (other than possibly FD) were obviously retaliating for Plaintiffs filing the *Norex* suit, and knowingly targeting their wrongdoing at Plaintiffs in Pennsylvania, where Plaintiffs reside and maintain their only United States office.

54.     Upon information and belief, Fridman and Kosogov knew of the falsity of the Releases and fabricated attachments.   Given that the dispute with Telenor involves billions of dollars, Fridman and Kosogov would have been intimately involved in the strategy of Alfa and Altimo to counter Telenor; Kosogov himself sent the Kosogov Letter included in the Releases.

Further, Fridman, an oligarch used to crushing his opponents in Russia, had reason to retaliate against Plaintiffs, given the highly negative publicity concerning the *Norex* suit.

55.    Upon information and belief, the members of Altimo's International Advisory Board knew of the falsity of the Releases and fabricated attachment prior to authorizing their publication, or, alternatively, were reckless and in disregard of the falsity in authorizing their publication prior to confirming their authenticity with Plaintiffs.

### Publication of the False Allegations and Fabricated Documents

56.    Defendants' knowingly false and malicious allegations that Plaintiffs procured paid false media articles about Altimo, Alfa, and Fridman have been published in the media (collectively, the "Publications"), including three publications on Russian language media websites, the originals and translations of which are attached as Exhibit D.

57.    As Defendants well know, much of Plaintiffs' practice derives from Russian speaking clients, such as the principal of Norex.  Defendants' specific intended result was to achieve publication in Russian speaking media accessible to Pennsylvania and the world in order to destroy this aspect of Plaintiffs' Pennsylvania based practice which relates to Russia and Ukraine.

58.    In other words, in order to cause the maximum harm to Plaintiffs, Defendants procured media articles on Russian language websites through their knowingly false and malicious Release and fabricated Attachments.  To compound this, by fabricating Marks' email, Defendants intended to send the message that Plaintiffs could not maintain confidentiality of their clients' matters, attacking the very foundation of the trust which clients seek in retaining attorneys.

**Defendants' Illegal Modus Operandi As Evidenced by the *Diligence* Case and
Risk that Defendants Illegally Obtained Privileged Documents From Plaintiffs**

59.      Alfa is involved in litigation over the control of Megafon, another

telecommunications company, against IPOC International Growth Fund Ltd.   ("IPOC") As part

of that litigation, Alfa, through an intermediary firm, engaged Diligence, Inc., a Washington

based investigation firm, to obtain materials about IPOC.

60.      In 2005, KMPG filed suit in federal court in the District of Columbia against

Diligence, alleging that Diligence obtained information from it about IPOC through deception by

pretending to be agents of Her Majesty's secret service in Bermuda.   According to media

reports, Diligence paid $1.7 million to settle the suit.

61.      In 2006, IPOC filed suit in federal court in the District of Columbia against

Diligence, alleging that Diligence obtained information about it from KMPG through the above-

described deception.    This case has been settled.  A media article about this case is attached as

Exhibit E.

62.      Upon information and belief, as part of Defendants' alleged investigation of

Telenor, they used Diligence or another investigation firm to attempt to obtain information

through deception or other illegal means.  The Attachments include the following documents

internal to Telenor and its apparent agents:

- Attachment 5 is a purported internal email dated June 4, 2008 between Telenor and Peter Necarsulmer, the head of the PBN Co. public relations firm containing a report on Alfa.

- Attachment 6 is the purported Stuart Lessor internal email dated Wed., August 28, 2008 (In fact, August 28, 2008 was a Thursday)

- Attachment 7 is a purported internal Telenor email dated Wed. Nov. 27. 2007 (In fact, November 27, 2007 was a Tuesday)

- Attachment 8 is a purported internal Guarda World email dated May 3, 2007.

- Attachment 9 appears to be an internal investigation report ordered by Telenor on Alfa in regard to activities in Ukraine.

- Attachment 10 appears to be an internal investigation report on Dmitry Friedman, the brother of Mikhail Fridman.

63.     Plaintiffs do not know whether any of the above documents are genuine; Attachment 7 appears to be a crude fabrication based on the date/day error (which also occurred in Attachment 6, the purported Lessor email).

64.     However, if any of the above internal documents are genuine, it would indicate that Defendants have procured documents related to Altimo through deception or other illegal means which may include interception of emails, burglary of premises, and bribery of agents.

65.     Upon information and belief, Defendants, in their malicious effort to smear Plaintiffs, used one or more of the above methods in order to obtain materials from Plaintiffs' office in this District.  While Defendants did not obtain materials related to Altimo because Plaintiffs had no involvement with Telenor (and thus Defendants resorted to fabricating evidence), Defendants may have obtained materials protected by attorney-client privilege and attorney work-product related to the *Norex* case, or other cases handled by Plaintiffs.

## COUNT I

## COMMON LAW DEFAMATION – PER SE

66.     The allegations of the above paragraphs are incorporated herein as if set out in full.

67.     A lawyer and law firm's good reputation is a prized and valuable asset.

68.     Defendants' Releases and Publications referring to Plaintiffs are defamatory in that they are harmful to the reputation of Plaintiffs and intended to lower Plaintiffs in the

estimation of the community and to deter third persons from associating with or dealing with Plaintiffs.

69.     Defendants' Releases and Publications referring to Plaintiffs have been disseminated worldwide, resulting in numerous media articles accessible on the Internet worldwide.

70.     Defendants' Releases and Publications referring to Plaintiffs were intended and specifically directed to harm Plaintiffs in Pennsylvania.

71.     Defendants' Releases and Publications clearly and directly refer to Plaintiffs and impute upon Plaintiffs' conduct and character in a manner that may adversely affect them in their lawful business and trade.

72.     Any reader of Defendants' Releases and Publications referring to Plaintiffs understood the allegations to mean that Plaintiffs were involved in illegal activity and serious business misconduct.

73.     Defendants' allegations that Plaintiffs engaged in illegal and fraudulent conduct in their business dealings is defamatory per se as it imputes criminal conduct and business misconduct by Plaintiffs; the allegations also create the false impression that Plaintiffs cannot maintain the confidentiality of communications related to their clients.

74.     Plaintiffs have suffered harm in Pennsylvania in the form of damage to their reputations and may lose business and potential business opportunities; in addition, Marks has suffered emotional distress, mental anguish, and humiliation in Pennsylvania.

75.     Defendants acted with malice when they intentionally and/or recklessly published the Releases and Publications in order to harm Plaintiffs in Pennsylvania.

76.     Defendants had no privilege or conditional privilege to publish the statements.

## COUNT II

## STATUTORY DEFAMATION - 42 Pa.C.S. § 8343

77.     The allegations of the above paragraphs are incorporated herein as if set out in full.

78.     Defendants' Releases and Publications referring to Plaintiffs are actionable under 42 Pa.C.S. § 8343 based on the facts alleged above.

## COUNT III

## INJURIOUS FALSEHOOD

79.     The allegations of the above paragraphs are incorporated herein as if set out in full.

80.     Defendants' Releases and Publications referring to Plaintiffs were intended to harm Plaintiffs by causing loss of current and potential business relationships resulting in pecuniary harm to Plaintiffs.

81.     Defendants recognized or, alternatively, were reckless in not recognizing, that their Releases and Publications referring to Plaintiffs were false.

82.     Defendants knew that any reader of the Releases and Publications referring to Plaintiffs would understand the allegations to mean that Plaintiffs were involved in illegal activity and serious business misconduct.

83.     Defendants' Releases and Publications referring to Plaintiffs were intended and specifically directed to harm Plaintiffs in Pennsylvania.

84.     Defendants' Releases and Publications referring to Plaintiffs caused harm to Plaintiffs in Pennsylvania.

16

## COUNT IV

## COMMERCIAL DISPARAGEMENT

85.     The allegations of the above paragraphs are incorporated herein as if set out in full.

86.     Defendants intended publication of the Releases referring to Plaintiffs to harm Plaintiffs' pecuniary interests and recognized that it was likely to do so.

87.     Defendants knew that the Releases and Publications referring to Plaintiffs were false or acted in reckless disregard of their falsity.

88.     Defendants knew that any reader of the Releases and Publications referring to Plaintiffs would understand the allegations to mean that Plaintiffs were involved in illegal activity and serious business misconduct.

89.     Defendants' false statements have caused pecuniary losses to Plaintiffs in Pennsylvania.

## COUNT V

## INTENTIONAL INTERFERENCE
## WITH PROSPECTIVE CONTRACTUAL RELATIONS

90.     The allegations of the above paragraphs are incorporated herein as if set out in full.

91.     At the time Defendants issued the Releases and effected the Publications, Plaintiffs had existing contractual and numerous prospective contractual relations with third parties.

92.     Defendants' false Releases and Publications were based upon ill will against Plaintiffs and a purposefully intended action to damage their reputation, diminish their standing

in the community, damage existing relationships, and prevent prospective relationships from occurring.

93.     Defendants had no privilege, conditional privilege or justification in making the false statements.

94.     As a result of Defendants' conduct, Plaintiffs have suffered harm in Pennsylvania to their professional business reputation and may lose existing business relationships and prospective business relationships.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL HARM

95.     The allegations of the above paragraphs are incorporated herein as if set out in full.

96.     Defendants engaged in a concerted effort to cause Marks cause severe emotional distress, anxiety, and humiliation.

97.     Defendants' conduct was extreme and outrageous, intentionally designed to cause harm to Marks.

98.     Defendants' false statements were intentionally and wantonly made against Marks.

99.     Defendants' conduct was outrageous in character and extreme in degree, as to go beyond all possible bounds of decency.

100.     Any persons of ordinary sensibility would suffer extreme emotional distress, anxiety, and humiliation if they were the target of Defendants' conduct, as did Marks.

## COUNT VII

## INVASION OF PRIVACY – FALSE LIGHT

101.    The allegations of the above paragraphs are incorporated herein as if set out in full.

102.    Defendants' Releases and Publications referring to Plaintiffs were intended to place Plaintiffs in a false light by alleging they were involved in illegal and serious business misconduct.

103.    Defendants knew that any reader of the Releases and Publications referring to Plaintiffs would understand the allegations to mean that Plaintiffs were involved in illegal activity and serious business misconduct.

104.    The false light created by Defendants would be highly offensive to any reasonable person.

105.    Defendants knew that the Releases and Publications referring to Plaintiffs were false or acted in reckless disregard of their falsity.

106.    Defendants' false statements have caused pecuniary losses to Plaintiffs in Pennsylvania.

**COUNT VIII**

**INJUNCTIVE RELIEF**

107.    The allegations of the above paragraphs are incorporated herein as if set out in full.

108.    Defendants have maliciously sent Releases containing knowingly false and malicious allegations and fabricated documents to the world.

109.    These knowingly false and malicious allegations have been published in media, currently available on the internet, i.e. the Publications.

110.    Despite demand, Defendants have not retracted the knowingly false and malicious allegations.

111.    Plaintiffs suffer irreparable harm to their reputations while such knowingly false and malicious allegations remain un-retracted.

112.    Plaintiffs request injunctive relief to at least partially remedy this ongoing harm as set forth below.

Wherefore, Plaintiffs request relief as follows:

a.   Compensatory damages in excess of $10 million;

b.   Punitive and Special Damages;

c.   Injunctive Relief compelling Defendants:

    i.   To issue a retraction letter (the "Retraction Letter"), retracting the allegations regarding Plaintiffs contained in the Altimo Package, admitting their falsity,

    ii.   To issue a media release to each entity to which the Altimo Letter was distributed retracting the allegations regarding Plaintiffs contained in the Altimo Package, attaching the Retraction Letter;

    iii.   To place an advertisement in each media which reported the allegations regarding Plaintiffs contained in the Altimo Package publishing the Retraction Letter;

    iv.   Otherwise to fund the costs of Plaintiffs distributing materials to the media and placing paid advertisements that the Court found that Defendants' allegations regarding Plaintiffs were false.

d.   Such other relief as is just and equitable;

e.   Costs and attorney fees.

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38, Plaintiffs hereby demand trial by jury on all appropriate issues.

BOCHETTO & LENZ

By: _____   27773
George Bochetto

MARKS & SOKOLOV, LLC

By: _____   63541
Thomas Sullivan
Attorneys for Plaintiffs

Dated:   12/4/2008

21