```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUCE S. MARKS, et al.         :       CIVIL ACTION
                               :
         v.                    :
                               :
ALFA GROUP, et al.             :       NO. 08-5651
```

MEMORANDUM

Bartle, C.J.                                          June 25, 2009

       Plaintiffs Bruce S. Marks and Marks, LLC, doing business as Marks & Sokolov, LLC, initiated this diversity action against three foreign defendants: Altimo Holdings & Investments Ltd. ("Altimo"), a holding company organized under the laws of the British Virgin Islands; Crown Finance Foundation ("Crown"), a holding company organized under the laws of the Principality of Liechtenstein and incorrectly identified for docketing purposes as "Alfa Group"; and Financial Dynamics, Ltd. ("Financial"), a London-based "business communications consultancy" incorporated under the laws of England and Wales. The complaint alleges: (1) common law defamation; (2) statutory defamation under Pennsylvania law; (3) injurious falsehood; (4) commercial disparagement; (5) intentional interference with prospective contractual relations; (6) intentional infliction of emotional harm; (7) invasion of privacy; and (8) injunctive relief. Plaintiffs also seek monetary relief, including punitive and special damages.

Before us is the motion of all defendants under Rules 12(b)(2) and (6) of the Federal Rules of Civil Procedure to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted.

I.

When a defendant moves to dismiss claims under Rule 12(b)(2), the plaintiff bears the burden of showing that personal jurisdiction exists.  See Marten v. Godwin, 499 F.3d 290, 295-96 (3d Cir. 2007).  At this stage the plaintiff must establish only "a prima facie case of personal jurisdiction" and is entitled to have his allegations taken as true and all factual disputes drawn in his favor.  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).[1]  Nonetheless, the plaintiff must allege "specific facts" rather than vague or conclusory assertions.  Marten, 499 F.3d at 298.

II.

Plaintiff Bruce Marks is a citizen of Pennsylvania.  He is the sole partner in plaintiff Marks, LLC, a Philadelphia law firm with seven attorneys.  Together with MS Ltd., a Moscow law firm with six attorneys, and MSB, Ltd., which maintains an office in Kiev with three attorneys, Marks, LLC does business under the moniker Marks & Sokolov, LLC.  Their practice focuses in part on

---

1. The court may later revisit the issue, at which point the plaintiff must produce competent evidence sufficient to establish the existence of jurisdiction by a preponderance of the evidence. Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

"representing persons harmed by fraud or corruption in Russia and Ukraine by finding means to bring their claims in the United States."  As a result, they have filed numerous cases against "Russian and Ukrainian criminal and business groups, including many powerful oligarchs ...."

Defendants, as noted above, are foreign corporate entities.  None maintains offices, owns real property, or conducts business in Pennsylvania.

Defendants Altimo and Crown have been involved in a prolonged dispute with Telenor, a Norwegian company, over ownership and control of a pair of telecommunications companies.  On November 12, 2008, Altimo sent a one-page open letter written by its chairman, Andrei Kosogov, to Telenor, accompanied by a three-page summary memorandum and twelve attachments (together, "the Releases").  In the letter, Kosogov requested that Telenor investigate "a wide range of documentary evidence ... which suggests there has been questionable activity directed at Altimo and the members of its International Advisory Board."  Kosogov wrote:

> A network of legal firms and public affairs agencies in Russia and the UK appear to have undertaken black PR campaigns in the media to try to discredit Altimo, its parent company Alfa Group, and its shareholders involving methods such as payments to journalists and newspapers for the publication of information ....

The accompanying memorandum, under the heading "Illegal and inappropriate activities of Telenor management against Altimo," asserts in pertinent part that:

> Altimo has recently discovered a number of documents which indicate that various acts of inappropriate and illegal behaviour might have been used by the current management of Telenor and companies hired by Telenor. ...
>
> The network of firms which appear from the evidence as working on behalf of Telenor include:
>
> Garda World and Hakluyt, two UK-based companies who directed both detective investigations and PR campaigns against Altimo.  The former has been instructed by Marks & Sokolov, a legal company operating in the UK, U.S. and Russia.
>
> PBN, an American PR-agent and lobbyist based in Moscow.
>
> Lobbynet, a Russian firm notoriously known for 'black' PR campaigns in the local media.

The memorandum further stated:

> In late March 2008, Marks & Sokolov initiated a number of paid publications in the Russian media to discredit Altimo, Alfa Group and their shareholders.  The campaign was directed through Garda World and managed in Russia by Lobbynet.  The publications concerned the sudden death of Leonid Rozhetskin, a Russian businessman previously involved in the Megafon affair, and speculated about Alfa's involvement in the plot.  As a result, three paid for articles appeared in Russian tabloid publications between 02 and 07 April, all discrediting Altimo and Alfa Group.

Among the twelve attachments to the letter was an email dated April 10, 2008, purportedly authored by plaintiff Bruce

Marks and addressed to a "garda-world.com" email address.  The email stated:

> Craig:
>
> I am not impressed with Lobbynet's PR attempts in Russia.  Their three articles to date have clearly not had the desired impact.  It is obvious that they have chosen media which lacks both integrity and the ability to impact.
>
> Please inform them that I will withhold payment as per our original contract until I see some positive results and show them to Telenor.
>
> I wait to hear how they intend to rectify the situation.

Also attached was an email dated August 28, 2008, purportedly from Stuart Lessor of PBN Co., which stated in part:

> Alfa proactively used AB to a) get lobbying contacts in UK and elsewhere; (b) as shield against media accusations; c) as link to investment banks.  They never work, but their names do.  As you are well aware, Bruce reports XX is also impressed by the composition of the AB, apparently acquainted with one of its U.S. fellows.

Defendant Financial, on behalf of Crown and Altimo, distributed copies of the Releases to "media worldwide" on November 12, 2008, the same day they were sent to Telenor.  On the following day, an article entitled "Alfa Group is possessed by spy mania" (the "Article") was published by three globally-accessible Russian media websites.  Written in the Russian language and Cyrillic alphabet, the Article as translated into English referenced plaintiffs as follows:

> Altimo confirms that in March of 2008 the law firm of Marks and Sokolov at Telenor's request initiated a number of publications in Russian mass media concerning the death of one of the founders of a mobile operator Megafon, Leonid Rozhetskin who disappeared in March of 2008 and possible Alfa Group's involvement [sic] in this matter.

According to plaintiffs, all representations concerning them in the Releases and the Article are entirely false.  As a result, they "have suffered harm in Pennsylvania in the form of damage to their reputations and may lose business and potential business opportunities; in addition, Marks has suffered emotional distress, mental anguish, and humiliation in Pennsylvania."  Plaintiffs now theorize that defendants circulated the defamatory Releases in retaliation for plaintiffs' participation in <u>Norex Petroleum Limited v. Access Industries, Inc., et al.</u>, Civ. A. No. 02-1499 (S.D.N.Y.), an ongoing case in which the plaintiff, Norex, is represented by Marks & Sokolov.  Norex alleges that the defendants, who include Crown, conspired to take control of an oil company owned by Norex in Russia through fraud, corruption of court proceedings, bribery, money laundering, and extortion.  The lawsuit was dismissed for lack of subject matter jurisdiction in 2007 and is currently on appeal.

### III.

A federal district court sitting in diversity may assert personal jurisdiction over a nonresident of the state in which the court sits only to the extent authorized by the law of that state.  Fed. R. Civ. P. 4(k)(1)(A).  Pennsylvania law

provides for jurisdiction coextensive with that allowed by the Due Process Clause of the Constitution.  42 Pa. Cons. Stat. Ann. § 5322(b).  As a result, we must determine whether an exercise of personal jurisdiction comports with federal law.

Two bases exist upon which a federal district court may exercise personal jurisdiction over a nonresident defendant: "General jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state. Specific jurisdiction exists when the claim arises from or relates to conduct purposely directed at the forum state." Marten, 499 F.3d at 296 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 nn.8-9 (1984)).  The complaint does not allege that defendants maintain systematic and continuous contacts with the forum state, Pennsylvania.  Thus, we clearly lack general jurisdiction over them.

Under the Due Process Clause, we may exercise specific jurisdiction only over defendants who have "certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation omitted).  A parallel inquiry is whether the defendant's contacts with the forum state are such that "he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

In Calder v. Jones, the Supreme Court addressed whether a court could exercise specific personal jurisdiction over non-

resident defendants charged with commission of intentional torts whose effects were felt in the forum state.  465 U.S. 783 (1984).  The plaintiff, an actress residing in California, had brought a defamation suit in California state court against a tabloid editor and reporter, both citizens of Florida and employees of the National Enquirer, a Florida corporation.  The Court emphasized that: (1) the story "concerned the California activities of a California resident," (2) it "was drawn from California sources," (3) the brunt of the harm to plaintiff's reputation was suffered in California, and (4) the National Enquirer had its largest circulation in California.  Id. at 788-90.  On that basis it concluded that "California is the focal point both of the [allegedly defamatory] story and of the harm suffered."  Id. at 789.  As a result, the exercise of personal jurisdiction over defendants was consistent with due process.

Our Court of Appeals expounded upon Calder in IMO Indus., Inc. v. Kiekert AG, a case in which IMO, a multinational corporation located in New Jersey, sued Kiekert, a German corporation, in New Jersey district court.  155 F.3d 254 (3d Cir. 1998).  The complaint alleged that Kiekert had committed a variety of business torts while attempting to prevent the sale of IMO's Italian subsidiary to one of Kiekert's competitors in France.  Specifically, Kiekert had sent letters threatening legal action to an IMO affiliate in New York, which were subsequently sent to IMO in New Jersey.  Kiekert had also made similar representations during telephone calls placed by IMO in New

Jersey.  IMO further established that Kiekert was aware of the fact that any damages caused by a collapse of the deal would be felt primarily by IMO in New Jersey.

Judge Becker, writing for the court, rejected the contention that Calder permitted jurisdiction simply because "the harm caused by the defendant's intentional tort is primarily felt within the forum."  Id. at 265.  Instead, he formulated the Calder test as requiring that:

> (1) the defendant committed an intentional tort;
>
> (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and
>
> (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

Id. at 265-66.  Applying that test, the court concluded that although some of Kiekert's communications had foreseeably reached IMO in New Jersey, and the harm had been suffered there, those facts alone were "not sufficient to overcome the clear implication from the surrounding facts that New Jersey was not the focus of the dispute."  Id. at 268.  Consequently, because Kiekert had not "expressly aimed its tortious conduct at the forum," jurisdiction did not lie.  Id.

Our Court of Appeals recently confirmed that the same rigorous standard applies to defamation suits in Marten v. Godwin.  499 F.3d 290 (3d Cir. 2007).  The plaintiff, Marten, a

resident of Pennsylvania, was a former participant in an internet-based correspondence degree program offered by the University of Kansas.  He had been accused of plagiarism by two of his professors, both residents of Kansas, and subsequently expelled.  Marten brought suit in this district, alleging that the accusations against him constituted defamation under state law.  Defendants, who had not made statements or sent materials to anyone in Pennsylvania other than Marten himself, moved to dismiss for lack of personal jurisdiction.  After discovery, the district court granted summary judgment in favor of the defendants on that basis.

For purposes of review the Court of Appeals treated the allegations of Marten's complaint as true and considered the case as having been dismissed pursuant to Rule 12(b)(2).  Id. at 295 n.2.  The court accepted Marten's allegations that the defendants knew he was a resident of Pennsylvania and knew that the brunt of the harm to his reputation from a wrongful allegation of plagiarism would occur in Pennsylvania.  It concluded, however, that Marten had not alleged the "specific facts" or "specific activity" showing a "deliberate targeting" of the forum state.  Id. at 298 (citing IMO, 155 F.3d at 266).  The panel observed as follows:

> The effects test and traditional specific jurisdiction analysis are different, but they are cut from the same cloth.  Just as the standard test prevents a defendant from being haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, the effects test prevents a

>     defendant from being haled into a
>     jurisdiction solely because the defendant
>     intentionally caused harm that was felt in
>     the forum state if the defendant did not
>     expressly aim his conduct at that state.

Id. at 297 (internal quotations and citations omitted).  On the facts alleged, Marten had shown "only that defendants harmed him while he happened to be residing in Pennsylvania."  Id. at 299; see also Remick v. Manfredy, 238 F.3d 248 (3d Cir. 2001).  The court affirmed the dismissal of Marten's suit on the basis of lack of personal jurisdiction.

District courts have likewise dismissed defamation claims for failure to satisfy the effects test, including where, as here, the situation is complicated by "the added wrinkle of the internet."  Gorman v. Jacobs, 597 F. Supp. 2d 541, 547 (E.D. Pa. 2009).  In Gorman, the plaintiff, a podiatrist practicing in Pennsylvania, sued three fellow doctors, non-residents of Pennsylvania, for defamation based on their comments on an online forum that was accessible to the general public.  The defendants had encouraged readers to report the plaintiff's alleged ethical violations to Pennsylvania-based and national medical associations.  Id. at 543.

Addressing defendants' Rule 12(b)(2) motion, Judge Dalzell concluded that the defendants had directed their comments at a national audience rather than a local one.  Id. at 549-51; see also English Sports Betting, Inc. v. Tostigan, Civ. A. No. 01-2202, 2002 WL 461592, at *3 (E.D. Pa. Mar. 15, 2002).  He observed that "[s]imply (a) knowing that the plaintiff is in the

-11-

forum state, (b) posting negative statements about the plaintiff's forum-related activities, and (c) referring to the forum in one's writing will not suffice to satisfy the Calder effects test."  Id. at 548.  Because the plaintiff had failed to show that the defendants had expressly aimed their comments into the forum of Pennsylvania, the case was dismissed.[2]

For present purposes, we accept as true that the Releases in issue here were defamatory and that defendants distributed those materials to "media worldwide."  We also assume based on plaintiffs' complaint that defendants were aware of plaintiffs' offices in Pennsylvania, Russia, and the Ukraine, and of plaintiffs' substantial client base in Russia.  Finally, we credit the assertion that plaintiffs "have suffered harm in Pennsylvania in the form of damage to their reputations and may lose business and potential business opportunities."

The first Calder element will always be satisfied in cases where, as here, the plaintiff sufficiently alleges that the defendant committed an intentional tort.  Before considering the second element, however, we are instructed to determine whether the plaintiff has satisfied the third element, which requires that the defendant "expressly aimed" defendant's tortious conduct at the forum state.  Id. at 266.

---

2. Notable appellate decisions from other circuits have produced similar results.  See Young v. New Haven Advocate, 315 F.3d 256 (4th Cir. 2002); Revell v. Lidov, 317 F.3d 467 (5th Cir. 2002).

There is no question that the Releases in issue here had no readily apparent connection with Pennsylvania.  They summarized the purported wrongdoing orchestrated by Telenor, a Norwegian company, against defendant Altimo, a holding company incorporated in the British Virgin Islands and having business interests in Russia.  Although the documents implicated plaintiffs in Telenor's wrongdoing, they did not mention plaintiffs' status as residents of Pennsylvania and instead described Marks & Sokolov as "a legal company operating in the UK, U.S. and Russia."  Nor did the Releases suggest that any of the described wrongdoing had occurred in the Commonwealth.  To the contrary, they stated that Marks & Sokolov had "initiated a number of publications in Russian mass media."

There are also no allegations that the Releases were specifically directed at Pennsylvania through the method by which they were distributed.  In plaintiffs' own words, the Releases were disseminated to "media worldwide," which indicates that the comments were directed, if anywhere, to a global audience.  As noted earlier, the district court in <u>Gorman</u> found that that fact alone warranted dismissal of the complaint for lack of personal jurisdiction.  597 F. Supp. 2d at 549-51; <u>see</u> <u>also</u> <u>English Sports Betting, Inc.</u>, 2002 WL 461592, at *3.

The Releases were later summarized in an Article carried by three Russian media websites which again did not mention Pennsylvania.  Although the relevant websites were technically accessible in Pennsylvania, those sites and the

Article itself were written in the Russian language using the Cyrillic alphabet.  Our Court of Appeals has recognized that when a publication is written entirely in a foreign language, it weighs heavily against a finding that the author intended to aim that content at an American audience.  Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454 (3d Cir. 2003); see also Noonan v. Winston Co., 135 F.3d 85, 91 (1st Cir. 1998).  On these facts it is plain that, as in IMO, "the focus of the dispute" is overseas, rather than in Pennsylvania, the forum state.  155 F.3d at 268.

Plaintiffs cite Dudnikov v. Chalk & Vermillion Fine Arts, Inc., 514 F.3d 1063 (10th Cir. 2008), for the proposition that personal jurisdiction exists here.  In that case, the defendants had disrupted a Colorado plaintiff's internet auction by filing a complaint in California with eBay, the auction website's proprietor.  Applying the effects test, the panel found sufficient evidence that "[d]efendants' express aim in acting was to halt a Colorado-based sale by a Colorado resident," and consequently, "neither the lack of defendants' physical presence in Colorado nor the fact that they used a California-based entity to effectuate this purpose" precluded an exercise of jurisdiction.  Id. at 1076.  Plaintiffs argue that as in Dudnikov, defendants here simply aimed an intentional tort at the forum state in a roundabout manner.

Even assuming our Court of Appeals would adopt the reasoning of Dudnikov, that decision is inapposite.  The sole effect of the action taken by the Dudnikov defendants in

-14-

California was to interfere with the plaintiff's auction in Colorado.  The defendants had thereby aimed their conduct into Colorado, which is where the heart of the dispute, the contested eBay auction, was in fact taking place.  Here, by contrast, plaintiffs allege only that defendants intended "to achieve publication in Russian speaking media accessible to Pennsylvania and the world in order to destroy ... Plaintiffs' Pennsylvania based practice which relates to Russia and Ukraine."  That allegation merely assumes the fact to be proved.  It is not an allegation of "specific activity" or "specific fact" showing a "deliberate targeting" of plaintiffs' Pennsylvania office as opposed to their law offices in Russia and the Ukraine.  IMO, 155 F.3d at 266; Marten, 499 F.3d at 298.  Nor have plaintiffs included any other suitably precise allegations in their complaint which demonstrate that defendants expressly aimed their conduct at Pennsylvania, a forum some 4,700 miles away.

As in IMO, Marten, and Gorman, plaintiffs have failed to satisfy the third element of the Calder test.  As a result, they have not carried their burden of demonstrating that sufficient minimum contacts exist for us to exercise specific jurisdiction over defendants.  Burger King Corp., 471 U.S. at 474.  Accordingly, we will grant the motion of defendants to dismiss the complaint in its entirety for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure.  We do not reach the question whether the complaint fails to state a claim upon which relief can be granted.